Good morning. This panel has one case for argument number 23-1916 in Re MTE Holdings. And I believe we have Mr. Cooney, our court-appointed amicus curiae, up first for six minutes, whenever you're ready. May it please the court, I'm David Cooney. I'm court-appointed amicus for the limited purpose of arguing that 28 U.S.C. 158 strips a magistrate judge of jurisdiction to hear and enter a final judgment from a bankruptcy matter, despite the language in 28 U.S.C. 636. In the few minutes that I have, I'd like to review why I think that's the correct outcome, and I'm going to take a very quick look at almost four decades of law, including legislative history, Supreme Court, and the leading cases. You know, Mr. Cooney, I was a district judge for many years and worked with magistrate judges, and the procedure we had at that time was if the parties agreed that the magistrate judge would take a certain case and decide it, that was fine. We didn't worry about the fact that this was an Article I judge, not an Article III judge, and the fact that there would be ultimate Article III review of the case, as we are doing here with this case, we felt satisfied any constitutional problems that might arise. Well, Judge Roth, I understand that and I appreciate it. There is a lot of popular support for the amicus program. I've got colleagues who assure me of that. But I think there are really two key questions here. One, did Congress authorize it at the appellate level? And second, if Congress did authorize it, is it constitutional? And I respectfully submit that, A, we don't need to reach the constitutional question today, but I don't think that is resolved. So I think the question before the panel I submit is the statutory question, and that is when you go back and you look at the Bankruptcy Reform Act all the way through BAFTA and you intercede the Magistrate Act, you know, what's the fair conclusion to come to in terms of legislative intent? And I submit that that really is the key to this case as I understand it. So I wanted to begin, if I might, with just the Bankruptcy Reform Act of 1978 had a very powerful statement that I don't think we should brush aside. It said a district court may not refer an appeal to a magistrate. And there are four key things about that that I think carry through to the modern day. Number one, it didn't exist in a vacuum. The concern over the brand new creation of bankruptcy judges and the movement in the referee system did create a concern, a concern about the slippage from Article III into Article I. There was no marathon yet, but it was in the background. Everybody was aware of it. The legislative thing that's key is that the provision in the Magistrate Act that said notwithstanding any provision and the power to hear additional matters was already there. That was in the 1976 version. So when Congress said that you cannot hear, magistrates cannot hear appeals, the Magistrate Act already had these two blanket provisions that everybody seems to point to and think that they're controlling, but they're not. Congress had hands-off appeals despite those two provisions. Now in 1979, the following year after the Bankruptcy Act was enacted, the 79 Magistrate Act then came into being. And that added subsection C, and that's the provision that says that a magistrate can hear any and all provision, any and all disputes. But it's pretty clear that if you look at the legislative history, Congress did not actually mean any or all. And there's a critical quote that I would ask the Court to look at. The legislative history says that the suggestion that specific categories of cases be designated for trial under 636C has not been adopted since there is inadequate experience at this point on which to recommend the inclusion of some categories and the exclusion of others. That is what Congress was saying in the legislative history is when they adopted C and said any or all. We don't know what we mean yet because we don't have enough experience. The only thing they included was Social Security appeals. And I would submit that when Congress said we don't know what we mean, but you can hear Social Security appeals, what they were really saying is that we're not ready yet to decide or even look at or even consider whether bankruptcy appeals should be considered. I want to suggest that in 1983, this Court had this decision in Morrissey. And this Court now had in front of it everything it needed to decide that bankruptcy appeals had all three provisions in the Magistrate Act. And it said despite all those provisions, bankruptcy magistrates may not hear bankruptcy appeals. And they said that for a very important reason. They said district courts are courts of limited jurisdiction and Congress must expressly grant them power and authority to hear and decide cases. And this Court found, and I believe correctly so, that there was no such express language. All there was was a boilerplate provision about any or all which Congress said we're not even sure what this means. So I think Morrissey made it clear that any conflict between 636 and 1334 had to be resolved in favor of the bankruptcy appellate scheme. In 1984, the next year, BAFTA is enacted. And that express exclusion, I admit, goes away. But it went away because we had 158, which is the exclusive grant of jurisdiction. And I don't think Congress gave up its entire bankruptcy appellate jurisdiction scheme to let the magistrate system take over. So every circuit court that has come along since has agreed with Morrissey. There's no dispute among the circuits. Morrissey was correct. Elcano Holmes, Minarets from the other circuits all agree that magistrate judges cannot hear appeals. Well, I think there's a different situation, though, when the parties agree to present it to the magistrate judge. And as the parties agree, I find little reason to need to go to the statutory foundation since the parties have agreed that it is appropriate. Well, my time is up. May I answer the question? Please answer. All right. So, Judge Roth, all due respect, I would disagree. I think the analysis has to be, did Congress permit it? So if the answer to that is no, does consent overcome that? And I think that's where you get to wellness. I think if Congress didn't permit it, that's the end of the analysis. So your question assumes, well, what if Congress was okay with it? Is consent valid? And that's when you get to the constitutional wellness issue. And I'm aware that the Supreme Court said, generally speaking, consent is effective for that delegation, but not at the appellate level. That issue has never been resolved. This court, well, I mean, you've got the Morrissey decision, but I think this court is on the threshold of what might be a game-changing decision. If you were to decide that Congress permits it and is constitutionally permitted, I believe this will be the first court to reach that decision. But even at the appellate level, there is Article III review available, even if, with the consent of the parties, the magistrate judge determines or reviews the bankruptcy judge's determination. It's still, the case is going to go to an Article III judge for final determination. Do I have time to answer? Please. So Judge Roth, I don't think the articles I'm going to suggest in two circuit court creeds agree. I don't believe that circuit court appellate review, bypassing the district court, and I guess the key point I didn't really get a chance to develop is that the statutory scheme is that district court review is critical. If you're going to, in order to have an appropriate delegation of Article III power, the judicial power, the Supreme Court has insisted that there must be sufficient district court review. If you give a magistrate the appellate right, then you bypass, the next appeal is to the circuit court. So you totally strip out the entire district court appeal process. And I would suggest that when you bypass the district court, that intermediate level, that that's impermissible constitutionally and inconsistent with the statutory scheme that Congress has adopted. Thank you, Mr. Cooper. May it please the court. My name is Jana Ryan, and I represent Chenault-Vaughn Family Partnership Limited, the appellant in this case, and the plaintiff below. I'd like to say that although my clients and I all want to proceed in the appellate court, and we are ready to proceed in the appellate court, I couldn't in good conscience disagree with the amicus. I don't think there's a gray area. I don't see any daylight. If I did, I would have argued it. But since the panel has invited the parties to address the merits, I'd like to do that. So first I'd like to address appendix page 497, and then I'll address the Centennial's affirmative defense theory, and then the property issue. So appendix page 497 is a letter that admits that Centennial had knowledge in November. Cindy Chatcher, or Cindy Chatcher Landman. Who is the person who signed this letter to appendix 497? Cindy Chatcher. T-S-C-H-A-C-H-E-R. Who is that? It's an employee of Centennial. Is this someone who has the authority to bind Centennial or make representations that appear to bind Centennial? Do we know this person's office? I would have to refer to the letter. Okay, I've got the letter up in front of me, and I don't know whether her title is Landman or her last name is Landman, but it's not clear to me. How does this make it unequivocal that Centennial intended to be bound? A Landman is a typical employee of an oil and gas company. Is it a high-level employee? A Landman? Is that someone who just goes and surveys the land? Well, they make title decisions, and that's what's important in a royalty interest case. Okay, but is Centennial, by the signature of this Landman, unequivocally manifesting, yes, we intend to be bound by this deal? We know that they haven't signed it, but we're still adopting it. Is the Landman the kind of person who does that? I think it raises, it just shows that they knew that the JOA had not been signed. That a Landman knew that. Is the Landman the kind of person who would make these kinds of, unequivocally appear to be the kind of person who would make the contracting decisions for Centennial? Well, that would raise a fact issue. Okay. Or it would allow judgment as a matter of law. Take me to the language in here that you think raises the fact issue. Show me what Appendix 497 does that. The letter states that the MDC, that the JOA was not signed by MDC. Okay. That shows that they knew. Did you point out that aspect of the letter to the bankruptcy court? Excuse me, please? Did you point out that language in the letter to the bankruptcy court at the summary judgment stage? Yes, I did, Your Honor. Okay. If you could have a citation ready for rebuttal and let us know where that was. I know that there was reference to this letter and the fact that there was a rescission on this date in November 2019, but I didn't see specific reference to the language about MDC not signing a JOA. That was central to the ratification argument in the response to Centennial's motion for summary judgment and in the original argument on summary judgment. Okay. Well, it will help to know where on rebuttal because your briefs were remarkably opaque about it. They just happened to throw in this citation, your briefs before the court of appeals. So I'd like to know where you said something more specific about it at the bankruptcy court. I'll find that. Okay. Thank you, Your Honor. Assuming that this letter shows that MDC knew in November of 2019, and also they knew in August of 2019 and other dates that are listed in my complaint and in the summary judgment briefing, the implications that you asked me to address are that it disputes the affidavit testimony that states that they didn't know until February 2020. And actually the wording of the affidavit testimony says they became aware that MDC was not a party in February of 2020. So this would meet the knowledge element of ratification. Okay. Do any of the orders, you cite the filing of the declaration of pooled units, signing of division orders, but does any of these documents say Centennial will be bound by the contract or it's going to pay, you know, the royalties that MDC owes? The division order does. Where? Cite it to me, please. The division order. Where is that in the appendix? In the appendix. I don't have the page number memorized. When you come back on rebuttal, tell us where and we'll look at it with you. Okay. It's a contract between Centennial and Chenault that's binding. And it says in April of 2019 that Centennial will pay a certain decimal percentage of royalties to Chenault from iron eagle unit B21H. And it's binding until it's revoked. And it was revoked in February 2020. And that's a contract between Centennial and Chenault. And that's regardless of Centennial's argument that MDC is not bound by the contract. I'm looking at the division orders from the end of 2019. And then the middle of 2020 is too late. But I don't see anything in it that says Centennial will front MDC's royalty payments. Again, maybe on rebuttal you can point us to where. That's not what it says.  Okay. So an understanding of Texas oil and gas law has to be there's a background understanding out of which these division orders arise. And it's authorized by the Texas Natural Resources Code. So the operator is the person who owns the right to produce, usually, unless the lessee owns the right to produce. So there's a misunderstanding in this case, which I was going to address in my second element. A royalty interest owner cannot sue under the JOA because it's not a third-party beneficiary. A royalty interest owner cannot sue a working interest owner. So the only reason they could sue was to address this affirmative defense with the assumption, the alternative assumption, that MDC. All right. Thank you, Ms. Ryan. We'll get you back on rebuttal. Mr. Crumpler, whenever you're ready. May it please the Court. My name's Rob Crumpler. I represent the Appellees, the Centennial Entities. And for the Court, I'd just simply like to note I'm joined by Ms. Lisa Paulson. I'd like to thank her for her wonderful briefing work on the case and Mr. Bill Hazleton. In addressing the issues, first and foremost, of course, jurisdiction. And let me touch upon that issue as raised by the Court. Our view is that when Congress acts, it presumably acts constitutionally and presumably enacts laws that will adhere to the Constitution and be legal. Our view on the jurisdiction issue is simply that 158 and 636 can be read together. They can be harmonized. And there is jurisdiction before this Court. Judge Roth, you raised the issue of the magistrate. The thing that I always go back to in 158, it is the jurisdiction of the district court. It is my view that when the district court proposed the consent of these parties to proceed before a magistrate, we were in the district court. We never left the district court. When parties proceed before a magistrate, they do so on the referral by the district court under the supervision of the district judge. That can be withdrawn and can be withdrawn at any time. So I believe that trying to, and even our pleadings in the case, of course, everything refers to us being in the district court. And so that is why I believe that the statute supports the concept of this particular referral and that a magistrate has the ability to conduct these proceedings. I must say, as a district judge, I always considered the magistrate judge to be part of the district court. Yes, Your Honor. I believe, and I think it's in this court in Prater, that they talk about the coextensive work between the district judge and the magistrate. And I think on the face of the statutes themselves, that's why this court has jurisdiction. And there are no constitutional concerns about the process by which an Article III judge does not have ultimate authority over the case. Because an Article III judge never loses authority over the case. And of course, as this court pointed out this morning, they didn't have rights of appeal to an Article III court like we're doing today. So, very good. Could you, when you're ready to talk about Appendix 497 and about the division orders, about what we should think about ratification here? Yes, Your Honor. So, in answering that question, in addressing it, I want to back up for just ever so briefly in terms of the relationship of the parties. Centennial was the operator of a unit. Centennial never had, does not have, a contractual relationship with Chenault Vaughan as to its lease ownership. The theory of ratification that is asserted. Well, first of all, it wasn't pled. The district court took up the issue. It wasn't part of the live pleading, but the court took it up. The idea of ratification is, was a contract created where none otherwise existed? It wasn't as if you had Chenault Vaughan and Centennial discussing a contract, negotiating a contract, and then one party performed and benefits were accepted. That didn't happen. There was no contract, and that's really not in dispute. Okay, but there was an understanding under which your client paid Chenault for over a year, right? And there is a written instrument that memorializes that understanding, and there's a missing signature in it, but do you agree that there was an understanding? I believe that there was a mistaken understanding of that, and we're probably referring to the division order that went out. I'm actually, well, right now I'm referring to the JOA, but we could also say the same about the division order. Well, Chenault Vaughan was never a party to the joint operating agreement. And the point I want to point to, to get back to Judge Bevis' initial ask on 497, look carefully at the letter. It is a letter as between Centennial and MDC Reeves Energy LLC, which was one of the working interest owners in the unit. It's talking about, it addresses the fact that MDC did not sign the joint operating agreement. An issue that is raised by 497 is, really, is there some ratification by Centennial and MDC as to the joint operating agreement? I think the key here is that your affiant said that Centennial was not aware until February 2020 that there was a missing signature. But now we have a document signed by an employee of your company that indicates otherwise. So why isn't that a disputed issue of material fact that needs to go to a jury? It's not a disputed issue of material fact because it doesn't matter on the timing. Mr. Fass, in signing the affidavit, was mistaken. I would point out the origination of the mistake, and for this court, I helped Mr. Fass with that particular affidavit. The supporting accounting that Mr. Fass was looking at and relying upon that's actually attached to his affidavit, you'll see that it was in February of 2020 when the accounting was switched over. It was in February of 20 when Centennial's accounting group acknowledged that Chenault's royalties should not be paid because MDC did not sign the joint operating agreement. Think about it in these terms. So the bottom line, Your Honor, is that the timing doesn't matter, and it doesn't create a fact issue. When Mr. Fass signed that affidavit, again, he was relying upon the accounting. He was simply mistaken about the prior letter that had gone out. Okay, so the notice to Landman's knowledge imputed to the company, you're not arguing that. How about the division order? What's the relevance of this division order at Appendix 482, I think is the one that's dated from the end of 2019? Chenault's claiming ratification and citing this as evidence. What do you say about it? I'd say the division order was simply sent mistaken and is not evidence of ratification of a lease. Because I want to put it in this context. Centennial could not ratify an agreement it's not a party to. Okay, so think about it as you play this out. Centennial has no ownership in the lease. So if it, quote, ratifies the lease and starts paying the royalty, who owns the working interests? My client doesn't own the working interests. It's not a record title owner of that oil and gas lease. And then eventually, MDC, as the owner of the oil and gas lease, it abandoned the lease. So now, Chenault Vaughn, the lease goes away. Chenault Vaughn is simply an unleased mineral owner. But yet it continues to say you have to pay the royalty. That doesn't, in all due respect, that doesn't work. A royalty is born out of a written contract, an oil and gas lease. When that oil and gas lease goes away, the ownership in the minerals reverts to the mineral owner, Chenault Vaughn. There's no contract to pay under. In that particular instance, you simply sit as co-tenant owners of the minerals. And the duties are at common law in Texas, where the duty for the co-tenant mineral owner, who's producing the minerals, is simply to account to the non-producing co-tenant owner. So you're talking about being, how your client is now a co-tenant mineral owner because MDC abandoned the lease during the bankruptcy process in, I think, 2021. Is that correct? That's right. But I think the relevant time that Chenault is talking about is that 2019 to February 2020, when Centennial was not a co-tenant. It was merely an operator. It was certainly an operator for Unit A and Unit B. And the question is about what the terms of that operator agreement were and any ancillary agreements such as division orders, correct? Yes, a little bit, a lot to unpack there. But there was never a ratification as between Centennial and MDC as to the joint operation, a joint operating agreement. For Unit B. I'm sorry? For Unit B. For Unit B, that's correct. Was there a ratification as the joint operating agreement for Unit A in 2019 and 2020? Unit A, MDC signed the joint operating agreement. There was no question. And for Unit A in that time period, 2019 to early 2020, was Centennial a payor of Chenault? At that point, they would have been paying under Unit A's joint operating agreement to Chenault Bond. Yes. Were they a payor as defined by the Texas Natural Resource Code? Under the joint operating agreement as to Unit A? Yes, because it is that signed agreement that gives the operator the – it puts the burden on the operator to pay all of the expenses and burdens of the unit. And that's generally viewed as part of the royalty obligation. If you really do a deep dive, though, however, under that particular model form joint operating agreement, the individual obligation always remains with the contributing owner. So even though the operator would be dispersing the royalties, ultimately the obligation to make sure that royalty is paid is on the contracting party to that joint operating agreement. So if you take that analysis and flip it over to Unit B, what was the agreement as between Centennial and MDC? There was no agreement. So at that point in time with MDC having the Chenault lease in hand but not signing the joint operating agreement, you have Centennial and MDC are co-tenant mineral owners, working interest owners in Unit B. What were the obligations at that point for Centennial? The obligations between Centennial to MDC was simply to account for the cost and a revenue associated with that development. At that point in time, Centennial didn't even have the right to do anything with MDC's dollars, pay its royalty, do anything, dispose of it, keep it, other than to account to use that production revenue to offset the expenses that were attributed to MDC's co-tenant mineral share of Unit B. Why was Centennial a co-tenant in 2019 of Unit B before MDC abandoned its working interest? Because it didn't sign the joint operating agreement. You basically had, and the reason for that is under that particular oil and gas lease, it was divided in ownership. You had MDC that owned 80% of it, and you had Lux that owned the other 20% of it. Lux contributed its portion of the oil and gas lease to Unit B and signed the joint operating agreement. So at that point in time, you had a portion of the lease that was signed up under the joint operating agreement, and you had a portion of the lease that was not part of the joint operations. Right. And that's why... So you were both co-tenant and operator. That's correct. That's correct. And it was that, but it's that lack of contractual relationship, it was that lack of contractual relationship that relieved or actually compelled Centennial without the power to pay those royalties. That alone fell on MDC to pay that royalty. It had that obligation. It had that obligation at common law, and it, I mean, even in... Well, I don't want to go to the right, because it didn't sign the joint operating agreement. And there's not a fact issue on the ratification piece of it. It's typically asserted as affirmative defense. It's used in this particular case as an affirmative claim. And frankly, there's not a fact issue on it, because there was no action taken by Centennial, there's no evidence taken by Centennial, whereby it acknowledged, you know, principally a contract that was not binding and made it binding on itself, because it's never been a party to that oil and gas lease as to Chenault Vaughan. The typical situation that arises, you know, with the ratification is when you have an agent out there conducting business on behalf of the principal that goes beyond the scope of that agent, the authority of that agent. And then when the principal learns all facts, says, well, agent, you went beyond your scope of authority or you didn't have authority to enter that transaction on my behalf, but now that I have the knowledge that you did that, I'm going to accept the benefits of that transaction. In this particular matter, when you apply that as to the relationship between Centennial and Chenault, there was no transaction. There was nobody out there acting on behalf of Centennial that created an oil and gas lease that royalties were paid. I see that I'm out of time. Thank you, Your Honor. Brian, I believe you have two minutes for rebuttal. Thank you, Your Honor. With regard to the motion for summary judgment and the appendix page, I didn't bring my appendix with me and I don't have computer access. But I will tell you, I complied with the briefing rules, and on page 4, item 5 of my brief, the list of issues, cites all of the record locations where the ratification issue was raised in my motion for summary judgment. Can you read item 5 to us? Item 5? Does the phrasing of it make clear that this is about the factual issue ratification? What does it say? It says, before abandonment, is Centennial obligated to pay ratified lease royalties based on Centennial's conduct, knowledge, and intent? Okay, so this was in a string citation of record citations after that. But was there anything said in the body of the brief about these specific documents, about how the division order amounted to ratification? Well, the division order doesn't amount to ratification. Okay, appendix 497. Hmm? Appendix 497, that's the argument that's made there? The November 19th, sorry, the, what is it? The November 19th, 2019 letter, is that the one that's mentioned? Yes. In the motion for summary judgment? Now, the division order is a separate issue. He's saying it's within that final portion of the brief, but it's a binding contract.  Your friend on the other side said, look, okay, we made a mistake in that affidavit. We're aware of this as of this time, but that doesn't matter, right? What's your response to his argument? Why is there awareness of it? If you couple their awareness of it, what other document do you add to that awareness that gives you a triable issue on whether they, in fact, ratify? On the ratification issue? Yeah. Well, the division order issue doesn't matter if they made a mistake. They're liable. On the ratification issue, we, I listed several documents. The, there's a memorandum of oil and gasoline, a memorandum of joint operating agreement, filed in August of 2019 by Centennial and the public record. Okay. The joint operating agreement. There are division orders. There are leases paid. I've got a red light here. May I continue? There are, so we've got the division order also indicates ratification. I'm looking at the division order right now. What in it indicates ratification? It's a separate contract, but it also indicates ratification because they issued the division order. What language in it unequivocally manifests an intent to be bound? I'm looking at it. Tell me. I don't have the language in front of me. Okay, you don't. But the division order, I can supplement with a 28-J letter if the court would like. I'm looking at it, but can you tell me what it says that unequivocally manifests it? The division order says that Centennial will pay royalties in a certain decimal percentage, and under the Natural Resources Code, that's what it means, and they actually set forth suggested language in the Natural Resources Code. Okay, the undersigned will pay, but no one appears to have signed this. So there's no undersigned. On unit 21H, well number 21H, it is signed. Okay, the December 31st, 2019 one is not signed. That's the disputed one. There's an April 19th, 2019 for unit 21H. Okay, I see that on June 24th, but the disputed one is not signed. So there's no undersigned. They can't sign it. There's no way to sign it. That's why we're having a lawsuit. If he signed that incorrect amount, he would be bound until it's revoked. Okay, fine. So he signed the one on April 19th. What besides the division order amounts to ratification? If we set aside the division order. There's the royalties paid and accepted each month, and with that comes an accounting that's required by the code. The fact that they paid the royalties each month and they had a statement of the royalties paid. Right, and the statement of royalties paid fits in the record at, I think it's 482 to 496. And then the memorandum of joint operating agreement at Appendix 315. That includes the Lux signature and the Centennial signature, but not the MDC signature, and that was filed in the public record by Centennial. Centennial with Lux. Okay. All right. Is there a particular language you want to direct me to in that one? In the memorandum of operating agreement? You just cited it. 315 is the signature page. Model form operating agreement. Yes. January 1, 2019, Eagle B unit. It's just a public record that there's an operating agreement in place, and it shows a signature page. Between Centennial and Lux, not between Centennial and MDC. MDC is listed there with no signature. Okay. The evidence is that Centennial knew that MDC had not signed the operating agreement, unless, I mean, it's evidence that they knew when they filed that document in the public record that, oh, we're missing a signature. Thank you. All right. We thank counsel for their helpful briefing and oral argument. We'll take this matter under advisement. Mr. Cuny, you were appointed by this court to brief and argue this case. The court thanks you very much for your service to the court. We will go off the record, but before we recess, we'd like to greet all counsel over here at sidebar to thank you for your helpful briefing and argument. Thank you.